IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 13, 2022

## STATE OF TENNESSEE v. JAMES STANLEY RADZVILOWICZ

**Appeal from the Circuit Court for Moore County**
**No. 2020-C2-1547   Forest A. Durard, Jr., Judge**

_____

### No. M2021-00671-CCA-R3-CD

_____

The Defendant, James Stanley Radzvilowicz, pled guilty in the Moore County Circuit Court to aggravated assault and was sentenced by the trial court to four years, six months, with eight months in confinement before release on supervised probation. On appeal, the Defendant argues that the trial court erred by denying his request for either judicial diversion or, in the alternative, full probation. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which J. ROSS DYER and JILL BARTEE AYERS, JJ., joined.

Robert T. Carter, Tullahoma, Tennessee, for the appellant, James Stanley Radzvilowicz.

Herbert H. Slatery III, Attorney General and Reporter; Richard D. Douglas, Assistant Attorney General; Robert J. Carter, District Attorney General; and Holly Hewgley, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

On November 20, 2020, the Moore County Grand Jury returned an indictment charging the Defendant with aggravated assault and possession of a handgun while under the influence. On January 29, 2021, the Defendant pled guilty to aggravated assault, with the sentencing left to the trial court's later determination. Pursuant to the terms of his

negotiated plea agreement, the second count of the indictment was dismissed. At the guilty plea hearing, the prosecutor recited the proof that the State would have relied on had the case gone to trial:

> So, Your Honor, if the State would put proof on it would be on May 2 of 2020 in the afternoon Moore County 911 received a call from Lisa Scaramuzzino requesting help with her husband known as [the Defendant] stating he was armed with a 9-millimeter handgun, he was intoxicated and threatening suicide.
>
> Deputies were dispatched and arrived and made contact with him. Found him to be armed with a handgun and he was uncooperative. He originally was inside the house, but came outside still armed, and he fired shots from the gun at which [] time the deputies requested backup. Additional officers arrived and around that time the [D]efendant went into his barn on his property. He left the barn a little later and a standoff occurred.
>
> They had also learned there were additional weapons in the house and the decision was made by law enforcement not to allow him in the home where they were.
>
> Dustin White[1] and Shane Taylor blocked off entry to the back of the house by positioning themselves between him and the back door, established communication with him and were trying to deescalate the situation. The Defendant appeared to be intoxicated and was yelling and making threats to shoot them if they came near him and did in fact fire into the woods, which happened to be the direction of the officers that were positioned there. While he was doing this, he was walking back and forth in his field and pointing the gun in various directions. And on three separate occasions approached Officers White and Taylor where they were positioned to keep him from going in the house where the other weapons were.
>
> On the third time he approached them he appeared to be coming in the backyard through the gate at which time they advanced on him. He had already put the gun in his waistband behind his back. Officer Shane Taylor deployed a taser in an attempt to subdue him and Justin [sic] White jumped over the fence into the pasture where he was located and attempted to get a hold of him. The taser was ineffective and the [D]efendant ran backwards

---

[1] During his recitation of the facts, the prosecutor referred to officer White as Dustin and Justin. He is referring to the same person.

breaking the wires of the taser and he began reaching around his back where the firearm was located. He pulled the pistol out of his waistband, fired a round that actually went through his shorts and at which time Justin [sic] White pulled his duty weapon and fired two rounds striking him to prevent him from firing additional rounds. The [D]efendant fell to the ground and dropped the gun and was taken into custody.

The State presented three witnesses at the May 21, 2021 sentencing hearing: Moore County Sheriff's Department Investigator Dustin White, the officer who shot the Defendant to stop the Defendant's from firing his weapon at the officers; Moore County Sheriff Tyler Hatfield, who arrived on the scene after the Defendant had been taken into custody; and Moore County Sheriff's Department Criminal Investigator Brandon Thomas, who was one of a number of officers on the scene during the standoff.

All three witnesses agreed that theirs was a small county, and all three expressed strong opposition to the Defendant's being granted judicial diversion, with each testifying that he did not believe it would be appropriate in light of the Defendant's violent acts and the message it would send to the community. Investigator White additionally described the emotional and psychological trauma that he and his wife had suffered as a result of the shooting and stated that, although he had been cleared of wrongdoing, the stigma of having been involved in a shooting would continue to follow him for the rest of his career. Investigator White also provided the additional detail that the Defendant repeatedly pointed his weapon directly at Investigator White and Captain Taylor during the standoff, describing the Defendant's actions as "lasering" the weapon at the two officers. On cross-examination, he acknowledged that the Defendant's weapon did not have a laser and that dashcam video did not show the Defendant "lasering" anyone.

The fifty-six-year-old Defendant testified that after graduation from high school in Connecticut, he joined the United States Navy, where he served six-and-a-half to seven years as a submariner before he was honorably discharged. He said he had planned to make the Navy his career but suffered a knee injury that resulted in his being "med-boarded out." He then began working "in the greens industry" for TruGreen and Chem-Lawn, eventually rising to the level of regional manager. At the time of the incident, he had left that industry and was employed "as kind of a regional operations manager" at Tim Ferguson Plumbing in Murfreesboro. In addition, he and his wife of thirteen years operated a small pet boarding facility on their property in Moore County.

The Defendant testified that he lost his job at Tim Ferguson Plumbing after the incident at issue. Because he and his wife knew they would be unable to make their mortgage payments, and because his wife needed help with his care, they had moved to

Jacksonville, Florida, where the Defendant's sister, who was in the medical field, could help with care-taking of the Defendant.

The Defendant testified that he was airlifted to Vanderbilt Hospital after he was shot. He said he spent thirty days at Vanderbilt before he was transferred to a physical rehabilitation facility. As a result of his wounds, he had nerve damage in his hand, "Barrett's Esophagus," a condition in which excess acid leads to precancerous cells in the esophagus, and fecal incontinence. The Defendant testified that his lack of bowel control made life difficult for him at times but he had obtained a job on February 22, 2021, as an account manager with Juniper Landscaping in Bradenton, Florida.

The Defendant testified that he was experiencing both work and family-related stress at the time of the incident due to his estrangement from his adult daughter, martial problems with his wife, and his fear that he was about to lose his job due to the pandemic. He said he spent the morning golfing with friends and drinking far more heavily than usual. As a result of his heavy drinking and the trauma from his injuries, he had no memory of the incident itself. The Defendant testified that he had always had the utmost respect for law enforcement and that his actions that day were completely out-of-character. He nonetheless acknowledged his responsibility for his actions, expressed his sorrow and remorse for his behavior, and offered his sincere apology to the law enforcement officers, the district attorney, and the court.

The Defendant testified that he had completed a four-month on-line course that helped him to understand the root causes and behavioral issues that led to the incident. He said he had not drunk alcohol since the incident. He was also currently meeting regularly with a therapist recommended through the Veterans Administration.

On cross-examination, the Defendant acknowledged that he drove himself home from golfing on the day of the incident despite having drunk so much alcohol that he had no memory of the incident. He conceded that he had a felony charge in Florida that was based on using someone else's identification but said the case had been dismissed for lack of evidence. Finally, he acknowledged that, at the time of the incident, he owned an illegal silencer.

Additional evidence the trial court considered in sentencing was the Defendant's presentence report and a handful of supportive letters submitted on the Defendant's behalf by his family, friends, and therapist. At the conclusion of the hearing, the trial court found two enhancement factors applicable: that the Defendant had no hesitation about committing a crime when the risk to human life was high, and that the victim of the aggravated assault was a law enforcement officer. Tenn. Code Ann. § 40-35-114(10), (19). The court weighed both enhancement factors heavily but assigned the most weight to the fact that the

victim was a law enforcement officer. The court gave some weight in mitigation to the Defendant's voluntary military service. Based on its weighing of the enhancement and mitigating factors, the court sentenced the Defendant as a Range I, standard offender to four and one-half years.

After reviewing the probation and judicial diversion factors, the court denied the Defendant's request for judicial diversion or a sentence of full probation, finding that the circumstances surrounding the offense, the deterrence value, and the interest of justice weighed against the granting of judicial diversion or full probation. The court, therefore, ordered that the Defendant serve the first eight months of his sentence in confinement before release to supervised probation. This appeal followed.

## ANALYSIS

The Defendant contends that the trial court erred in denying probation based solely on the circumstances of the offense and in denying judicial diversion without conducting a meaningful analysis of the *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) factors. The State argues that the trial court did not abuse its discretion in sentencing the Defendant. We agree with the State.

A trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing; and

(8) The result of the validated risk and needs assessment conducted by the

department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." *State v. Bise*, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* at 707. This same standard of review applies to the trial court's decisions regarding probation or other alternative sentencing, *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012), as well as the decision to grant or deny judicial diversion. *State v. King*, 432 S.W.3d 316, 324-25 (Tenn. 2014).

In determining whether to grant diversion, the trial court must consider the following common law factors: (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, (f) the deterrence value to the accused as well as others, and (g) whether judicial diversion will serve the interests of the public as well as the accused. *Id.* at 326; *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). A trial court should not deny judicial diversion without explaining the factors in support of its denial and how those factors outweigh other factors in favor of diversion. *King*, 432 S.W.3d at 326; *Electroplating*, 990 S.W.2d at 229. When the trial court considers the common law factors, "specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion," then this court will "apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision." *King*, 432 S.W.3d at 327. A trial court's failure to consider the common law factors results in a loss of the presumption of reasonableness, and this court will either conduct a de novo review or remand the case to the trial court for reconsideration. *Id.* at 327-28.

The Defendant has the burden of demonstrating his suitability for probation. *State v. Trent*, 533 S.W.3d 282, 291 (Tenn. 2017). In evaluating the suitability of probation, the trial court should consider the same factors applicable to diversion: "(1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) special and general deterrence value." *Id.* Before a trial court can deny probation based solely on the basis of the offense, "the circumstances of the offense as particularly

committed in the case under consideration must demonstrate that the defendant committed the offense in some manner more egregious than is contemplated simply by the elements of the offense." *Id.* at 291-2.

Although the trial court did not go into a detailed analysis of each *Electroplating* factor, the record reflects that it considered the principles of sentencing, appropriately addressed and weighed the relevant probation and diversion factors, and placed on the record its reasons for denying judicial diversion or full probation. The court recognized the Defendant's minimal criminal history, his military service, his steady employment, and his familial relationships and found that those factors weighed in favor of judicial diversion. The court further found, however, that the circumstances of the offense, the deterrence value to others, and whether judicial diversion would serve the ends of justice were all factors that weighed heavily against diversion or full probation.

The trial court was particularly concerned with the extreme danger the intoxicated Defendant had posed to the officers and neighborhood residents, observing that "there is not much worse than having a person highly intoxicated with a 9-millimeter semi-automatic pistol in their hand." However, although the trial court emphasized the serious nature of the offense, it is clear from the record that it did not deny probation or judicial diversion based solely on that factor.

We find no abuse of discretion in the trial court's denial of judicial diversion or a sentence of full probation. Accordingly, we affirm the sentencing determinations of the trial court.

## CONCLUSION

Based on the foregoing review and analysis, we affirm the judgment of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE